[Civ. No. 21025.   Second Dist., Div. One.   Jan. 19, 1956.]

EDWARD T. RATHBURN, Respondent, v. BERNICE HARRISON RATHBURN, Appellant.

Allen L. Leonard and Prudence M. Thrift for Appellant.

Neal E. Dow for Respondent.

WHITE, P. J.—Defendant Bernice Harrison Rathburn appeals from a judgment annulling her marriage with plaintiff Edward T. Rathburn on the ground that at the time said marriage was solemnized defendant had a secret intention to refuse to consummate the marriage by permitting or engaging in reasonable or any sexual intercourse and that following said marriage defendant carried out said secret intention by continuing to refuse to consummate said marriage.

Plaintiff and defendant were married in Las Vegas on February 9, 1954, and separated February 12, 1954. On February 18, 1954, six days after the separation, plaintiff

filed suit for annulment on the foregoing grounds. Defendant answered and cross-complained for separate maintenance and for damages based on fraud and deceit. By her answer defendant denied generally the allegations of plaintiff's complaint and alleged that she had entered into said marriage in good faith and with the intention to consummate the same by reasonable sexual intercourse and denied that she refused to consummate the marriage by permitting reasonable marital relations. As an affirmative defense, defendant alleged that at the time the parties were married and thereafter, through February 12, 1954, plaintiff was impotent, "and was unable to consummate the marriage by sexual intercourse because of his own inability to copulate." By her cross-complaint defendant sought a decree of separate maintenance on the ground ef extreme cruelty and also prayed for damages for fraud and deceit.

Following trial, the court found that defendant at the time of entering into the marriage ceremony falsely and fraudulently represented to plaintiff that she was entering into said marriage with good faith and the intention of consummating said marriage by permitting and engaging in sexual relations with plaintiff, but that defendant had a secret intention to refuse to consummate said marriage by permitting or engaging in reasonable sexual intercourse; that from the date of marriage to the date of separation defendant carried out her secret intention by refusing to engage in reasonable sexual intercourse.

The trial court further found that the plaintiff did not refuse but willingly engaged in attempts to copulate, and it was not true that plaintiff had no ability to copulate; that it was further not true that plaintiff was unwilling to work out the marriage relation; that it was not true that plaintiff was unable to copulate.

It was further found that defendant did not lose her employment through misconduct of the plaintiff and did not suffer any damage in any sum by reason of any acts of the plaintiff; that it was not true that defendant suffered shame and humiliation or that said shame and humiliation was wilfully inflicted upon defendant by plaintiff and that she did not suffer any damage in any sum by reason of the acts of plaintiff. Judgment was accordingly entered, from which defendant prosecutes this appeal.

We deem it unnecessary to set forth the evidence in great detail. Suffice it to say that the testimony was in sharp conflict. Plaintiff testified that he and defendant arrived

at Las Vegas, Nevada, about 2 p. m., obtained a hotel room with twin beds, and went to sleep. That about 6 p. m. defendant arose and said, ''Well, if we are going to get married we'll have to go over and get it over with.'' That the marriage was solemnized about 7:30 or 8 p. m. They returned to the hotel about midnight, whereupon ''I put on my pajamas, when I came out she had made no effort to go to bed, after a bit I said 'Aren't you going to bed,' and she said 'I guess so.'

''She was gone about half to three quarters of an hour, before she returned, and she walked past my bed over to her bed and laid down. I grabbed her hand and asked her, talked to her about things, and she didn't act like she wanted to be loved at all. She wanted to know if I had any protection for her. I said, 'No I had no protection.' I never thought of such a thing. She said, 'Well I won't have anything to do with you tonight because you have no protection for me.' ''

Plaintiff further testified that on the following morning he awakened about 8 o'clock and found defendant up and dressed. That while he was dressing defendant said, ''I want to go home tomorrow.'' That he said, ''What is your hurry, we were going to stay until Friday or Saturday,'' to which defendant replied, ''I'm homesick. I want to go home.'' Plaintiff further testified that on that evening they had dinner and attended a show, arriving at their hotel about midnight. He retired and asked defendant if she ''was coming to bed?'' to which she replied, ''No, I am going to write a letter.'' That defendant again refused to consummate the marriage and plaintiff went to sleep. On the following morning defendant insisted upon returning home, which they did, arriving at the latter's home about 6 p. m. Later, after going to plaintiff's home, the latter asked defendant if she was not coming to bed and she said, ''After awhile, I am in no hurry.'' That he asked her, ''if she wanted to be loved?'' and she said, ''I don't know whether I do or not.'' Plaintiff further testified that on the following morning he said to defendant, ''It seems like we are having a very poor honeymoon, and we are going into third day of a funny honeymoon, and the way it looks to me, I don't believe you care for me, the way you have treated me and the way you have acted, and I think it is best to quit right now,'' and that he said to her, ''It is better to have this thing annulled.'' That defendant replied, ''If that is

the way you want it, that's the way it will be.'' Plaintiff further testified, ''I said, 'Well, I think it is best.' I never talked a cross word with her; she always did to me, always snappy, sassy. So it went on, she said, 'I will go home,' so she got her things ready.

''So we sat around until 4 or 5 o'clock.

''I said, 'if you are going to stay here tonight, I ask you to be a wife to me, like you should.' I said, 'I will put on clean clothes and we will go out and eat.' We went out and came back about 7:00 o'clock, we sat around.

''I got tired looking at T.V., she wouldn't talk to me unless I said something, and if I did, it was always 'I guess so, can't remember, don't know,' so I said, 'well, I am going to bed, ain't you coming?' She said, 'no, I am in no hurry,' so I went to bed, that was about 10:00 o'clock.

''So I waited for her three-quarters of an hour to come to bed. She knew I was awake, and I laid there, talked to her, asked her if she wanted to be loved. She said, 'I don't know if I want to or not.' Well, I just wanted to disappear, I felt so bad.

''I talked to her about things and she jumped out of bed and said 'I am going home right now, I will take a taxi and go home.' I said, 'let's wait until morning, I can go in the other room and sleep.' She said, 'no, I am going home right now, I will take a taxi and go home.'

''She dressed and I said, 'well, if you are bound to go home, I will put on my clothes,' I got my car out and she drove home.

''On the way home I talked to her about things and I said, 'Now Bernice, I think it is better for us to quit as friends than enemies,' and I said, 'as you said, having this thing annulled, what do you advise me to do.' She said, 'Get a lawyer, and he will advise you what to do.' ''

Defendant testified that on the night of the marriage plaintiff made an attempt to have sexual relations with her but was unable to have an erection. That she attempted to ''cooperate'' with plaintiff but to no avail. She denied stating to plaintiff that she was homesick and wanted to go home. She testified that on Wednesday night plaintiff was asleep when she went to bed. That on the following morning she observed plaintiff counting his money in the purse he had put in her bureau drawer, felt insulted and only then said she would like to go home. That on the following day when they returned home and went to plaintiff's apartment, the latter again made an attempt at intercourse but without

success. That plaintiff commenced drinking whiskey and said, "Well, you have to be happy right now or you never will be, so you might as well go home." That she stated she wanted time to get adjusted, but that plaintiff insisted that the marriage be immediately annulled. Defendant further testified that she had known plaintiff some 16 or 17 years prior to their marriage. That she was employed at the Internal Revenue Department of the federal government and that plaintiff urged her to resign her position and be free to travel with him. That as a civil service employee she had eight years of seniority, earned $3,350 per year with certain retirement funds which had been accumulated. Plaintiff denied urging defendant to resign her position and testified that he told her that if she desired she was free to retain her position, but that defendant stated, "No, I don't like the place, and I want to quit."

As a first ground for reversal of the judgment, appellant contends that the court committed reversible error in refusing to order a physical examination of respondent. In this regard the record reflects that appellant made a motion for a physical examination of both parties, in which motion respondent joined. The motion was granted but after hearing the testimony the court concluded that only an examination of respondent was necessary. To this the latter agreed. The matter was continued pending selection by the court of a competent physician. When the cause was again called the trial judge stated:

"In this matter, I finally concluded that I should deny the application for appointment of an expert witness inasmuch as the inquiry I was able to make indicates an examination would not be of any real help in a matter of this kind; after all, it is a matter of resolving the conflict in the testimony between plaintiff and defendant.

"Apparently a medical examination would not resolve that particular conflict."

There being no further testimony offered, the matter was submitted, resulting in the aforesaid findings and judgment for respondent.

This is not a divorce action having for its objective the dissolution of the bonds of a valid marriage by reason of something which occurred after the marriage, but is an annulment proceeding founded upon the theory that no valid marriage ever existed by reason of some cause which was present at the time of marriage. ▮ The weight of author-

ity is to the effect that if one of the parties to a marriage goes through the ceremony with an intention not to consummate the marriage by marital intercourse, and persists in such intention, an annulment will be granted upon the application of the other party on the ground of fraud. ▮ In consenting to a marriage, in consenting to enter into that personal relation, each of the parties impliedly promises the other that he or she will perform the duties and obligations of the relation, and the promise and consent of one are given in consideration of and in reliance upon the promise and consent of the other. One who so promises and represents, thus obtaining the consent of the other, with the secret determination not to fulfill the promise, must be held to have obtained such consent of the other party by fraud—at least where the promise relates to a material matter. ▮ When, therefore, the court concluded upon substantial though conflicting evidence that appellant at the time of the solemnization of the marriage "had the secret intention to refuse to consummate said marriage by permitting or engaging in reasonable or any sexual intercourse," and persisted therein, a judgment of annulment was justified. ▮ And, since the court believed the testimony of respondent and disbelieved that of appellant, we fail to see wherein the latter was prejudiced by the court's refusal to order a physical examination of respondent. The expert testimony resulting from such an examination would at most be cumulative, and the court would not be bound to accept the opinion of the expert as conclusive.

Appellant's contention that the judgment is not supported by the evidence or the law cannot be sustained. While it may reasonably be conceded that a court should not annul a marriage on the ground of fraud, where the particular fraud goes to the very essence of the marriage relation, except upon a clear and convincing showing, we can see in this record no sufficient warrant for disturbing the judgment of the court below.

▮ Insofar as appellant's final claim that a decree of separate maintenance and damages for fraud and deceit should be given her is concerned, we are again confronted with the long established rule that appellate tribunals are not authorized to retry the cause. We are limited to a determination of whether the record contains substantial evidence, contradicted or uncontradicted, that will support the findings of the duly constituted arbiter of the facts. All of appellant's testimony in support of the charges of cruelty and

deceit were contradicted by respondent and the court chose to believe the latter. ██ Under familiar rules, we are without power to disturb the conclusion arrived at by the sole judge of the credibility of witnesses and the value and effect of evidence, unless we can say that upon no hypothesis whatever is there sufficient substantial evidence to support such conclusions. From a reading of the evidentiary narrative in the case at bar, we cannot so hold.

The judgment is affirmed.

Doran, J., and Nourse (Paul), J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.